0156579 International Society for Krishna Consciousness, California, Inc. v. City of Los Angeles. Yes, Your Honor, if it may please the Court, John Werlich on behalf of the City of Los Angeles. At the council table is also Tim Daze with the City Attorney's Office, actually out of the airport at LAX. Let me ask you a question. Don't you think this case ought to be certified to the California Supreme Court? Absolutely agree, totally. If that were done, how would we state the question to be certified? There are various ways to state that question. I think the best way to state it is if we put it limited to some extent to what we're talking about specifically at LAX, number one, and number two, relate it to, let me suggest what I think the question should be. Is Los Angeles International Airport and other similar airports in California a public forum, a non-public forum, or a designated public forum for purposes of the California Liberty of Speech Clause? I think that puts the question directly and immediately to the Court. And I think the resolution of that kind of a question, I believe, would assist every airport certainly in California and I think assist the rest of the governments in the city, not just the city but throughout the state in knowing and understanding what is the test in California for determining when government property is or is not a public forum. Why can't we answer that question under existing California Supreme Court law? Why is it so uncertain? Well, because unfortunately California Supreme Court law has not really addressed that kind of question specifically. We have N. Ray Hoffman, which was decided in 1967, which is a case that touches a little bit on that issue. We have the Pruneyard case of 1979 that touches upon that issue, although if you look at those two cases, those two specific cases deal with private property, not with government property. And those two cases focus particularly on two cases, Marsh v. Alabama and Tucker v. Texas, 1935 cases that dealt with state action issues where they basically said that in one instance a railroad and another one, another kind of that were private railroads that built basically company towns and said, and I think we've all heard this expression, if it walks like a duck and talks like a duck, it must be a duck. It was those kind of cases that the California Supreme Court in 1967 read, reviewed, and came to a conclusion and said that Los Angeles, the train station in Los Angeles is, while it is owned by a private entity, it is also subject, at least in context of the state action, is subject to being essentially a government in a sense. And they talked about it being a public, the term public forum came up, but I don't think it was in relationship to government property. I think the focus of the court was primarily on are we going to change, how are we going to interpret the law to say that this private piece of property can be viewed as public property, as opposed to this is government property, how do we look at it? Is it a traditional public forum? Is it a non-public forum? Is it a designated public forum? Let me, the California Supreme Court hasn't adopted that kind of an analysis. They have not. So do you think it's likely that they would sort of import the framework, the analytical framework, the U.S. Supreme Court? I believe they would. I honestly believe they would. What leads you to believe that? Because I think it's clearer than, certainly clearer than what the appellate court cases are doing now. And I think it's clearer even, well, I can't say that Carreras and Kuba are not clear, because they are clear. That is, they're just, in my view, not consistent with what I think the California law is. But why do I think they would take it? Because I think that they took a case relating to Carreras some five years ago. Yes, I know. I know it well. Because it related to your Honor's case. I understand that, and I appreciate that. And I understand that a district court has to follow, certainly has to follow precedent involving a Ninth Circuit decision. And I understand that, notwithstanding that, the California Supreme Court came out, made a ruling, and actually wanted, if you look at Los Angeles Alliance for Survival, the California Supreme Court case, it was very specific. I think it was Ronald George, the judge, who talked about it and said, that authored that decision and said, in essence, you know, it's really great that we have this ability to accept these kind of questions under 29.5. That was the existing section. They accepted one recently, and we got a decision on that. They do accept them. And I think that decision reflects the question. I guess, you know, the way you framed the question sort of posed the answer that you want the court to give. And, you know, we can frame any question we want and ask them. They can reframe it when you give it to them. They do that. In fact, they did that in the Alliance case. The court framed the question for them. They reframed it, and then when they got the briefing, they went back to the original question that was posed to them. I remember that, yes. That question isn't meant to propose the answer to the question. I think it's meant to just be clear. The case was sent back to the district court by the other earlier panel. It did ultimately go back to the district court. And as I understand it, there was a resolution of it. It was sent back for discovery and whatever so that the matter could be then certified to the Supreme Court on a full record. This case, absolutely. Yes. It was. And we spent innumerable hours. And the cost is there. Years. No, we sent it back. We said, we're going to certify it. Get the record ready. Precisely. And it took a long time, and there's a lot of reasons why. And I don't want to belabor the point why, because I think there are different issues came up. But there was a lot of facts. And there were like, I think, probably 10 different expert witnesses. I could say purported expert witnesses in some instances, but I think for the most part that different parts of the country we had to go to, we had to depose, we had to read their expert reports, some of them hundreds of pages long. Plus there were, as the court is aware, and I know you've seen the record, we're talking about probably 25, 30 different volumes of excerpts of record just in this case alone. Is this 01 case? 01, yes. 01. This is 01. 01. Is it here? I can't remember. Was there a judgment, a summary judgment in this one case, or is it a preliminary injunction that's here? We went beyond the preliminary injunction. In the case, Judge Marshall, in I think it was 2001, issued a permanent injunction that was appealed. It went to the Ninth Circuit. We argued it in December of 2002. They came out with their order in March 21st, 2003. So there was an actual judgment that was then referred back to Judge Marshall, and we've gone through this process of Of augmenting the record. Augmenting the record. And basically what the TAC, I suppose you said the TAC The statute was amended. Excuse me? The statute was amended. The ordinance. No, it was not amended at that time. There was another one. You're right, there was a second ordinance, and that second ordinance is in the second case. But that second ordinance was a response to Judge Marshall's decision, not necessarily to what the appellate court did. And it was changed. That ordinance wasn't changed. Actually, a new ordinance was set forth in its place, taking a different approach. And I would wholeheartedly agree that some questions should be able to be resolved and put forward. And if the court would like some other dialogue involving different kinds of stuff. No, I'm just curious. I think Judge Perkerson hit the nail on the head. I mean, how does the city think that the question should be framed? Well, I think that would be direct, immediate, not meant to give the answer. One could, I suppose, put, or is there a basic incompatibility test that Have you sat down in the past and drafted out? I have, yes. You just gave it to us? That's the one that, the latest one that I have drafted out in my head. There are different options, frankly. And I think if we took that one I just mentioned a few minutes ago, perhaps and put a comma or another sentence and said, or has the Federal scheme been supplanted by the basic incompatibility test? I'm not trying to say what their answer should be. Do we have your suggestion in writing precisely what the question should be? Do you have that stated that way? No. You do have a question in writing that, but it doesn't state it precisely that way. I'm just thinking maybe we should get the recommendation from both sides before we decide I think that would be an excellent idea. what the certificate question is going to be. We'll take care of that. You want to save some time for rebuttal? Yes, thank you. I appreciate that. Thank you. Good morning, Your Honors. David Lieberman for the Plaintiffs International Society for Christian Consciousness. Robert Most is with me this morning. May it please the Court. Obviously, we do not support the concept of certification to the California Supreme Court. Why not? Well, at least in Case 01, it's been going on for 10 years. Well, it'll be going on for another 10 years. Well, I understand that, Your Honor. We're not supposed to address a federal constitutional issue if the question can be decided on the basis of state law. And that's exactly what... And who better to decide what the state law is, what interpret the state constitution, than the state Supreme Court? Because whatever we decide is not binding. And then you have the California Constitution, which is a more expansive concept of free speech. And apparently, the federal constitution requires it. Well, I would just like to point out a few important elements of 01. What's wrong with that? Well, the critical element of certification, as well as supplemental jurisdiction and abstention, is substantial uncertainty. And in order for certification to be appropriate, in order for the court to decline to exercise supplemental jurisdiction or to abstain from hearing the state court issues, there must be substantial uncertainty about the state law question. Well, if we want to certify an issue of state law to the state Supreme Court, isn't that just a matter of our discretion? Well, I think that in the Ninth Circuit, there is absolutely no uncertainty whatsoever. Let me just point out a very critical point. Are you saying that it is not a matter of our discretion? It's like we did not... I happened to be involved in the Carreras case in 1985. The briefing on the principle that federal courts should not reach the constitutional questions under federal law, if there is an alternative ground under state law in which the case can be decided, was briefed quite minimally, maybe three or four pages. The Ninth Circuit took that case and ran with it. And in Cuba, obviously ISCON did not have anything to do with that case, and Cuba followed Carreras. Every issue in Carreras was upheld by Cuba, and every federal court that has dealt with that issue. There is no uncertainty in the state court. We have Hoffman. We have Fogelson. We have People v. Singer. We have Lawrence Livermore. We have Prisoners Union under the state court. In federal court, we have Carreras. We have Cuba. We have L.A. Alliance, in which Judge Paez said we are bound by the rulings of the Ninth Circuit. I was a trial judge at the time. Excuse me? I was a trial judge. I understand that. But the Ninth Circuit has said that as well in a number of cases. Judge Kaczynski himself said that in one case. Judge Kaczynski is the one who said, here, we ought to certify it, isn't he? Well, he said, we might. There was no, it was just a minute order. He said, we intend to certify it, so go create a good record. So for the last two years, you've been doing what we told you to do because the Kaczynski panel said, you know, we intend to certify it. But there was a motion for certification made in 01, a formal motion. But that went to what we call a motions panel, and the motions panel denied it. That didn't stop the merits panel, Kaczynski's panel, from taking another hard look at that. No, I understand that. And now we have another panel. That's correct. That can do whatever it is. Well, you know, there's one thing that strikes me about all of this. It is correct that I was involved in the alliance for justice case, and I followed Carreras, as I understood it at the time. And when it got here to the Ninth Circuit, the Ninth Circuit said, hmm, there's an interesting issue here about whether or not solicitation is content-based. And it wasn't, it wasn't, you know, I had thought that it was pretty clear under California jurisprudence at that time that it was clear. And there was no way. But the Ninth Circuit certified that question to the California Supreme Court. They granted certification. And they did a very lengthy analysis. And I was surprised. I hadn't read that case in a long, long time, and I read it over the weekend. And they did a very extensive analysis of the California Constitution and the U.S. Supreme Court cases that have addressed that issue. And they ended up taking a slightly different approach than the federal, than the Supreme Court has taken with respect to solicitation. And the California Supreme Court said that solicitation is not content. An ordinance, you know, regulation restricting solicitation is not content-based. The only issue that was addressed by L.A. Alliance was the content discrimination. That's correct. But what's important for me is that they took, they did something, you know, that I was actually surprised about, the way they came out, which suggests that, you know, the Supreme Court's jurisprudence in this whole area, when you're talking about solicitation and you're talking about restrictions on solicitation and location and whatnot, that their approach to these issues is not yet firm. You can't point to a California Supreme Court case that really addresses this issue concretely. Hoffman. Not exactly. Hoffman, Fogelson, People v. Singer, Lawrence Livermore, Prisoners Union. We have five state court decisions that say the test for determining whether there's a public forum under California law is compatibility. In 01, we had Judge Davies that reached the same conclusion. We had Judge Marshall that reached the same conclusion. They took a motion for certification that was denied. Two summary judgment motions were granted. They argued quite aggressively that supplemental jurisdiction should not be exercised. That was denied. They argued quite aggressively that the court should abstain. That was denied. So we have this whole record in 01, and nothing has really changed in that time. The cases are precisely the same. The world has changed. That's what's changed. Well, the world has changed, but the experts... Airports are no longer anything even close to what they used to be. But that has nothing to do with solicitors. No. That has nothing to do with solicitors. One of our experts, Steve Elson, who the city likes to marginalize as somewhat of a crackpot, in his deposition, he's a former Navy SEAL. He worked for the DEA. His thesis in the Military Academy was on terrorism, which is a classified document. His job in the military was to secure military installations from terrorist attacks. He worked on the FAA Red Team. That's the FAA agency that tries to get explosives and weapons past security. He, on the record, said, I will bet that I can get 75, 80, 85 percent of weapons and explosives past TSA security. And within the last two or three weeks, we found, it's all over the papers, GAO did a... I'm missing the implications of your point. We know it's not perfect. It has nothing to do with solicitors. There is no governmental interest that solicitors have any kind of a causal relationship to airport security. And there must be that kind of a causal relationship. What did Lee say about all of this? Lee didn't say anything about that. He said an airport can never be a public forum under federal law. Well, that's federal law. That's federal law. But they did say that the sidewalks... Let me ask you this. Do you know of any case decided after Lee in which the state Supreme Court held that the airport was a public forum under the state's Constitution? I do not, but I do know that the city of St. Louis refused to uphold a regulation that would have banned solicitors from the inside of the airport. Lee did say... 2327, which is the first case, that is a complete ban. That bans solicitation not only inside the airport, but on the sidewalks and the parking lots. Lee made it very clear that the sidewalks were available. And that factored into their decision on the inside of the airport. Here, they're banning it on the sidewalks. They're banning it in the parking lots. And there is absolutely no basis in the record from any witness that solicitors... There's not one piece of literature. I defy the city to come up here with one professional study, with one document from the TSA, or from the city of Los Angeles, or from any law enforcement agency, that says that soliciting... There's a causal relationship. And there has to be a causal relationship. There has to be a good fit. What would happen? Let's assume for a second that the California Supreme Court has been given a question that everybody has come up with. And it comes back with an opinion that says that LAX is simply a nonpublic forum. It's not a public forum under California's liberty or speech clause. Would that alter our view of this case? I think it does alter part of the review of this case. A lot of it. Although Judge Marshall did rule on the Federal issue. In the second case. In the second case, yes. But if they came back and they said that, it would alter this case tremendously. But the point is, is that... And they might. The certification code itself says that in order for certification to be appropriate, there must be substantial uncertainty about understanding... I'll tell you, I'm substantially uncertain as to what they would do. Carreras is a dinosaur case compared to the world we live in now. Cuba is not a dinosaur case. Cuviello, which was just decided last August and follows Cuba right down the line, it's the latest decision on this issue is not a dinosaur case. Is that an airport? It's not an airport. Cuba dealt with the Cow Palace in San Francisco. I understand that, Your Honor. But still, the test, the test is what we have to focus on. Maybe, maybe. Not whether it's an airport, not whether it's an entertainment facility, not whether it's a street or a sidewalk. Nobody likes this, but airports are different now than everything, than cow palaces, than shopping malls. But we've already had the opportunity... Life. I go through the airport now and they treat me like, I mean, everybody gets searched. X-rays. I have a friend who used to live in Idaho, just passed away, who saved George Bush in World War II. He was one of the fighter planes overhead. They strip-searched him every time he went through the airport because he had metal all over his body from his war wounds. I mean, airports are different. McCoy, you know what the NAACP says, as well as the Airline Pilots Association, which is a Seventh Circuit case, that the forum is defined by the access sought by the speaker. ISCON has made it clear throughout the entire history of this case that we do not approach people in ticket lines. We do not approach people in security lines. We do not approach people in baggage-retrieval areas. We do not approach people where they may be a captive audience. So you're going off again on the merits of your case, not on the overriding question of certification. These are all easily addressed by time, place, and manner regulations. Create a buffer zone around the security areas. This is as simple as that. I offered, I drafted a modification of the preliminary injunction in case number one, 2327, that would have created a banned solicitation of any sort in the security lines. That fell on deaf ears. Of any what? That would have banned any solicitation in any security lines, in ticket lines, in baggage-retrieval areas. I offered. I drafted a modification of the preliminary injunction. The city turned us down flat. They slammed the door in our face. And I have some theories about why they did that. They wanted to make the airport look as bad as possible, so when we came to this court, we would already be in a hole 12 feet deep. It didn't have to be that way. It doesn't have to be that way. Your time is beginning to run out, but just assume for a moment that we might, that we're inclined to certify a question such as the one posed by counsel for the city to the California Supreme Court. What would you suggest? How would you suggest that we should frame such a question? Well, I think the question is whether an airport is a public forum. Just plain and simple. Plain and simple. Pretty straightforward. Yeah. But I would like to end with a quote, which I don't usually do, but I would like to end with a quote from Judge Kuczynski himself in Hart v. Mocenari. And I think this is really something that the court has to answer. And this is what he said. Binding authority cannot be considered and cast aside. It is not merely evidence of what the law is. Rather, case law on point is the law. If a court must decide an issue governed by a prior opinion, that constitutes binding authority. The latter court is bound to reach the same result even if it considers the rule unwise or incorrect. Binding authority must be followed unless and until overruled by a body competent to do so. The court further emphasized that circuit law binds all courts within a particular circuit, including the court of appeals itself. Thus, the first panel to consider an issue sets the law, not only for all the inferior courts in the circuit, but also future panels of the court of appeals. Does that mean we're prohibited from certifying a state law issue to the California Supreme Court if there's a previous 20-year-old case that dealt with that issue? No certification? I believe it does, Your Honor. You know, certification didn't exist at the time of Carreras. I understand that. It wasn't until much later. I understand that. It just wasn't available. Because as Malcolm Lucas told me, we've got enough business over here. You take care of your own. I understand that. But the point is that I think that the city could have gone into state court on any number of occasions just because they couldn't figure out how to do it. It doesn't mean that ISCON should pay the price for that and extend this case any longer. You could have gone into state court, too, couldn't you? And we could have. But why should we have to do it? We went where? You know, it seems you're afraid of the state court system. As I said, we did not create Carreras. Carreras created Carreras. We did not create Cuba. Cuba created Cuba. So, I mean, this is very clear. They have one in my ‑‑ I've done some extensive research on this. And as far as I can tell, they have one procedural avenue, en banc. I mean, that's assuming that the court would rule in favor of ISCON in this case. They have en banc. They should go to the en banc panel and ask the entire court to hear the case and get rid of Carreras, get rid of Cuba, get rid of Cuviela. The en banc court would probably certify the questions to the California Supreme Court. But we don't know that. It's discretionary. It's discretionary. We do not have ‑‑ We've got a good idea how things work. We do not have one case to the contrary. Let me ask you a question. Under the new statute, what does that allow you to do? The latest city court. It allows this court to ask the California Supreme Court to decide a particular issue. All right. You understand me. What are you doing out at the airport today? Okay. That's an important point. I think that's what ‑‑ Okay. That's what I'm asking. Okay. What is allowed? What is allowed out there right now, today? If I were to go out to the airport today, what might I encounter in terms of solicitors? You have 18 dark closets out of which to solicit. Yes. I'm glad Your Honor picked up on Judge Marshall's personal observations of the designated area system that the city has implemented. The sidewalks are open. The parking lots are open. The inside of the airport is ostensibly open. But in reality, as confirmed by Judge Marshall, it's really useless. It's not even worth applying for a permit. So what's the problem? What's the problem with the sidewalks? The sidewalks are good as far as they go. I mean, the sidewalks are empty much of the time. People are hustling and bustling. It's not the same environment as the inside of the airport. They're hustling and bustling there. There is some hustling and bustling there, but there are many places where there isn't. Like where? In the green areas identified by the city on their maps. Those are public circulation areas. Those are not ticket lines. Those are not security areas. You're allowed in there? No. No. No. Are those circulation areas beyond the security? Beyond the security point? No. Before the security point, sort of the general area where people can wait for people coming off planes and down the ramps? No. It's both. It's the arrivals level lobby areas, and it's also in the departure area, in the green circulation areas. And I would like to point out something else. I know they've got special places set aside for smokers, but I avoid LAX. I go to Burbank. And that's getting crowded, too. Okay. So all the places that they've designated, maybe you can work something out with them. We're trying. But I would like to point – Let me ask you this. How much money do you raise? With the designated areas or without the designated areas? Before 9-11, how much did you raise? Maybe $200,000, $300,000 a year. That was substantially affected after 9-11. And also, ISCON has been a good citizen. When the TSA says the airport is too dangerous, everybody out. ISCON has never fought that. ISCON has never challenged that. ISCON is always abided by in the best interest of the security and the safety of the passengers and the people that are present in the airport. But there is an important point here. We're not just solicitors. ISCON speaks to people about their religious belief. ISCON distributes religious literature. As a last resort, as a last element, I should say, they ask for a donation to cover the cost of the literature. And ISCON is offered to exchange – and I think this is consistent, entirely consistent with Lee, which I read as a physical exchange of money case and not the words that come out of a solicitor's mouth. The way the ordinance is currently enforced, and there's declarations by Mr. Werlich to this effect, is that if you even talk about a donation, if your intent is to seek a donation, then you have to confine all of your activities to these designated areas, which Judge Marshall aptly described. So the point is that what we've offered is that let us go around and speak to people. Other groups and individuals are allowed to do that. Let us go around and distribute literature. And then if somebody – I'm sorry, Your Honor. I just want to finish one thought. If somebody wants to make a donation, we will bring them to the designated area where the physical exchange of money can take place. That is what Lee was all about. And Justice Kennedy's concurring opinion makes it very clear that it's not the business of the government to start censoring the words coming out of a First Amendment practitioner's mouth, and that's exactly what LAX officials are doing. They're censoring the words. Part of the problem is you represent one interest. ISCON may or may not be a good citizen. I'll give you the – it's a good citizen. But they've got to have procedures, policies, rules that cover everybody. And so we might say, well, here's the deal, but then everybody gets that treatment. And maybe they're bad citizens. And if we say, well, you're bad citizens and you're good citizens, and now we've really got a hornet's nest on our hands. And I have two responses to that. Number one, it's Hornbook law. Enforce fraud. Enforce misrepresentation. Enforce interference with pedestrian traffic flow. Enforce any kind of inappropriate conduct by laws that are on the books. Secondly, we have offered on many occasions – on many occasions we have offered to support the city in its efforts to crack down on these other groups that were not good citizens. We have offered, we'll stay away from your security areas. Give us a buffer zone. We won't get anywhere near it. We'll stay away from your ticketing areas. We won't bother people that are potentially a captive audience. We won't do any of these things. We've offered this on numerous occasions, and all we've got is a door slammed in our face. So we've offered to do all these things, and there's no reason that ISCON should be punished. Between 2002 and 2005, over 100 – I think it's 170 million people passed through those terminals at that airport. There were a total of 12 complaints against ISCON, all coming in 2004. Not one complaint involved security. Not one. Is there anybody out there soliciting now? Yes, there is, Your Honor. And where are they located? They're – as far as I can tell, they're on the sidewalks. And every now and then they're able to get a designated area that they don't have to share with three or four other groups, which is creating all kinds of dissension and embarrassment and friction between the various groups competing for the attention of passersby. That creates more problems than it solves, these little designated areas, trying to cram all these competing groups into a two-by-six area. So we've offered many, many solutions. I went before the city council, and I had a whole list of rules and regulations. If somebody says no, that's the end of it. We walk away. Period. End of story. No further argument. If they're in a line, that's the end of it. We don't go there. We've offered this to the city council. We offered it to Judge Galanter's committee. We've offered it to the Board of Airport Commissioners. And all we've gotten is, as I said over and over again, all we've gotten is the door slammed in our face. Have they bothered to tell you why they don't accept your proposals? No. Just slammed the door in your face. Just slammed the door in our face. This has been going on for over 30 years. These cases, the first one started in 1997, the second one started in 2000. But the litigation over First Amendment activities in the airport has been going on, even if we look at Carrera since 1985. Actually, it's been going on since 1974. Do folks wear any kind of a uniform? Some of them wear the traditional Indian garb. The robes, the saris, the women, the markings on the forehead. But I think Mr. Becker over here has some of that paraphernalia that he's wearing today. And in three years with 170 million people, 12 complaints, is that a governmental interest? Is there a good fit between these regulations and what's actually going on out at the airport? We're as against any kind of illegal conduct as anybody else. And we've offered to help the airport in any way we can. And there's absolutely no justification that we should be punished when we're doing the right thing, when we're being good citizens and we're exercising our activities in the best traditions of the First Amendment, we should be punished for a few bad apples. It's not fair. And it's not justified under the law because, as I said, the key to all of this is uncertainty of the law. Under all of the central issues that are central to this case, and we do not have that in this case. Now, what if they had – how many different groups are out there soliciting? Maybe six or seven, eight or nine. I'm not – I'm not exactly sure. It varies from the time of the year, the time of the day, the weather. We're not – and the – If they had separate areas for each group and they weren't all bunched together. And would that – would that – that would help? That would help one problem. We've also offered to limit the number of total solicitors allowed in any single terminal. We've also allowed to limit the hours of the day in which a solicitation is allowed, because as the stipulation of facts will confirm, there are certain times of the day that are busier than others. Oh, yeah. So – but those hours are quite unusual. It's 4 a.m. to about 9.30 a.m. in the morning is the major peak period out at LAX. But we've offered – we've offered to work with the airport to – and this is what Hoffman says. This is what Hoffman says. This is what Carrera said. This is what Kuba said over and over again. This is what Kuviela said over and over again, that the issue is compatibility. These issues, these concerns do not establish incompatibility, but they do justify time, place and manner regulations. And we have repeatedly proposed time, place and manner regulations that would address and I believe rectify the concerns of the city. So why unnecessarily go to this extent to curtail First Amendment activities, which are at least to some people in this country mean something? And I'm not saying it doesn't mean anything to the court, but certainly government agencies, it's the last thing on their list. It's not the first thing on their list. But there's not a single expert on security that has identified solicitors in the airport. And if you really want to – if you really want to deal with the problem, then you kick everybody out of the airport except ticketed passengers. This is a handful. Cincinnati Discovery Network, Pocatello, Project 80 versus City of Pocatello make it very clear that if you take – by taking 15, 20 solicitors out of the airport and leaving 200 million people there, it's not going to solve anything. And if you add 20 people to that mix, that's not going to do anything. That's not going to have any impact one way or the other either. So you don't even have that element. You don't even have – you don't even have a causal relationship. I'm trying to visualize this. The people, you know, last time it was LAX, you have to take an escalator up, and there's where the security lines are. And once you get up on that second level, then the public is not – once you get in the security, you can't get in the line unless you show your ticket and your ID. That actually – that process actually starts at the bottom of the escalators in some of the terminals. In other terminals, some of it's on the same level. But as I've said, we do not even get near those areas. And we are not going to challenge a regulation. Where do you get near? Well, we just go off by the parts of the airport, 15, 20 feet away from those security areas, ticketing lines. There's a duty-free shop corridor in the international terminal. There's a whole corridor of shops and boutiques and other paraphernalia. It's a whole corridor. You can get in there without going through security? Not at the current time, no, Your Honor. Oh, okay. But you – Do you want to go through the security area into the – where these duty-free shops are? No. That's in the non-sterile area. That's accessible to anybody. Anybody can walk into the airport and buy something in any one of those stores. In the duty-free stores? Yes, assuming you qualify. There's some other stores that are not duty-free. And you can buy anything you want in those stores. You can go up to the food court on the mezzanine level of the international terminal and have lunch or have dinner. And there's no restrictions on that whatsoever. Anybody can walk into that airport at any time they want. Now, the airport may like it, may not like it. They may say it's for transportation, it's for this, it's for that. But the point is that anybody at this point of time can walk into that airport for any reason they want to. And there is no restriction except for something illegal, obviously. There are no restrictions on what somebody can walk into that airport for at the present time. They can go in there and buy something or just meet somebody coming in, see somebody taking off, or even walk around and just look around. There's no restrictions whatsoever. It's a major public facility. It's in the same level as Pruneyard. It's the same level as all of these cases that talk about these big, massive regional facilities where the public congregates, where the public is present. And these places, the California Supreme Court has said over and over again, should be made available for the peaceful exercise. How about in other airports like JFK? In JFK, my last understanding was the sidewalks were available. And you could distribute literature inside the terminal.  For example, let me give you an example. How about San Francisco? They have designated areas in San Francisco. And that's satisfactory? No. It's a zoo. Because there aren't enough of them and their location is terrible. And there's too many groups to accommodate. There's not enough designated areas to accommodate the number of groups seeking access to the airport. But let me just give one example. If an ISCON solicitor wanted to… What if there was no solicitation for funds? You just had religious literature. And you wanted to talk to people about your religion. No money involved. Right. No solicitation. Right. Is that permitted? In LAX? Yeah. Yes, that's permitted in LAX. Without the solicitation. Without the solicitation, it's permitted. But here's the thing. In Lee, the court placed a great deal of emphasis on the availability of the exterior sidewalks. Under the city's current interpretation of 171.07, which is the second case, the designated area case, an ISCON solicitor could talk to somebody in the airport, could say, here's our Bhagavad Gita or Srimad Bhagavatam or other eastern literature. And then in the course of that conversation, that person may offer to give a donation or a request may be made for a donation. And you cannot even bring that person out on the sidewalk to exchange that donation. You can't even bring them out on the sidewalk, which is available. You have to stay in these areas. Why don't we hear from the city? Thank you, Your Honor. Should we go to the second case? Yeah, let's go to the second case. The second case. Well, that's a switch. That would be. That's a switch to deal. All right. Let's just go back to the city on this. Yeah. Okay. I think it would be better to go back to the city. Thank you. I think the Court, in just the dialogue that's gone on here, has kind of upstaged some of the comments I might have made, in the sense that I think you're pretty well familiar with a lot of the things. I'm talking about case number 0156579. It seems that we kind of drifted a little bit into the second case. And so I'll wait on those, if it might be better. But as far as the. . . Well, you know, just trying to ask the question. I'm just curious about it. If the California Supreme Court were to say the airport isn't a public forum. Say it is not a public forum? It's not a public forum. Right. And then you have the Court's decision in alliance. How would that affect all of the analysis of the. . . Well, if it's a. . . The complete ban that you have under this ordinance. If the Court says that it is a public forum. I mean a non-public forum, as Your Honor. It would certainly affect the analysis without question, because the scrutiny that goes into analyzing the particular regulation involved is substantially less. As Justice Pergerson brought up, New York offers more than even the second case that we just talked about, 171.07. In New York, there are no designated areas. LAX offers designated areas. And as the Court, and I think I said in my. . . It is unfortunately a true situation that after 9-11, at least with respect to airports, everything is different. And it's our view that even Lee, the concepts in Lee, remember, had nothing to do with security. All it had to do with was pedestrian congestion. That was the only thing. Number two, in Lee, you had retail establishments. You had even Justice O'Connor saying that the facilities in JFK were. . . Now, what's wrong with their proposal? That's what I'm. . . Okay. Forget about those other airports. They say they want to just go in there. They limit the number of people. They're going to stay away from people lining up for this or that or baggage. And they'll go to these designated areas and not be herded in with a whole group of other people. And they're primarily there to proselytize. And to ask for some money. Regarding the designated areas. . . What's wrong with that? Okay. Regarding the designated areas. . . How dangerous is that? We have already resolved that. The enforcement mechanism for Section 17107, when they give permits, they do not mix in these designated areas different groups. That's already been accommodated and taken care of. You won't find a Hare Krishna member and a Red Cross member or whatever else, however you want to look at it. That's already been taken care of. What Mr. Lieberman has said is not the correct way that it's being enforced right now. But you're restricting people. You have to stay in this area. You have to stay in that area. Absolutely. But you're not bothering anybody. It is bothering people. How do they bother people? We have over 60 different declarations on the subject matter where they get in front of people. Remember, the airport, when you're talking about. . . We're only talking about interior, well, in the second case. But generally speaking, they bother people. When people go to the airport now, they're anxious. They're upset. They really are. They've got all of these things in their mind, as the Court kind of alluded to a little earlier. It's crowded. It's havoc in some instances. They have their tickets. Do they use an e-ticket? What can they put in their luggage? What are they going to get searched? You have to put your lip gloss in a little plastic bag. Right, and it has to be a see-through bag. It can't be an opaque. I mean, there are a lot of things on people's minds. That's a lot of bureaucratic stuff. It is, but unfortunately, it relates to how a person who comes to LAX and is a traveler, how they perceive what is there. It's kind of like a doe with light in their eyes. I mean, it can happen that way. These people, we've had declarations from a lot of them talking about their, I don't want to use the word confrontation, but let's say their experiences with different solicitors. And frankly, as far as ISCON members, they're probably, I would concede they're the best of 20 groups at LAX, not six groups. All right, so you get another group and the other group causes a problem? You kick them out. We need to. Well, unfortunately, it's not quite that easy. Why? Well, because you can't really kick people out of, theoretically, you do have a right to practice first. You can't come here and solicit. We have, there is a provision in 171.07, that's the second case. We're not on it now, but essentially in a way we are, which provides that if you are convicted, criminally convicted of soliciting, violating the ordinance, going inside the terminals and not getting a permit, et cetera, et cetera, et cetera, if you're convicted three times within six months, that's going to be fun. Three times within six months, you can have your permit yanked from you permanently. But the odds of that taking place are frankly insurmountable. There's just one thing I'm trying to understand about it. The first case is a complete ban. The first case is not totally a complete ban. What's left under the first case? If the first case, the ordinance in the first case were to survive, what could they, what is the extent of the solicitation that would be allowed? They can do absolutely anything the First Amendment allows other than immediately receive money in three different locations at the airport. Absolutely anything. What's the problem with getting money? The problem with getting money is like in the Lee case, the Heffron case, even the case before this Ninth Circuit, the Acorn case, all talked about the problematic aspect of when you ask for money, you reach in your pocket. There's a lot of different things you do when people ask you for money. You're thinking, gee, should I give to this cause? Should I not give to this cause? In the process of doing that, what is happening? You're in a stream of traffic, in a flow of traffic. People are blocked. They're walking around. That's in part what's wrong. So the first case, if the ordinance isn't held in the 01 case, it bans the receipt of money. Immediate receipt, yes. Immediate receipt of money. So they would still be allowed to hand out. They can hand out literature. They can do virtually anything else. They can give little envelopes, you know. They can give envelopes. They can give their. Put your contribution in here. Precisely. They can give envelopes. They can hand out their e-mail addresses. They can hand out websites. They can do anything that most of the people in the city of Los Angeles do, whether it's United Way or anyone else. What if you had disabled veterans out there that are part of an organization like the DAV, and they're trying to raise some funds to get extra canes or whatever? To my knowledge, I've never. What? To my knowledge, the disabled veterans have never been out to LAX to solicit for money. Well, if they did. If they were to do it, if they were to do it, they would not be able under Section 2327, they would not be able to accept money. That's right. Okay, so you think that if the California Supreme Court holds that this is not, the airport's not a public forum and solicitation of money is not content-based, the end result is that it's a very low level of reasonableness test and that a complete ban on accepting money might pass constitutional muster? I absolutely believe that, given the change in the landscape today. You're not enforcing the first ordinance now. We're not enforcing it, and actually we have never enforced it. Well, then what's the point of the first case if you've gone to a second ordinance that you say you can live with? The second case, the second ordinance is a, I think, described as a stopgap measure. We were concerned with, the airport was concerned with the number of solicitors that were still out there and couldn't do anything because the judge issued a permanent injunction and said we need to do something, right, particularly when we knew 9-11 occurred and the public area, the, so that area was reduced. If you win case one, you'll change the ordinance in case two. If we win case one. Yeah, if you win O-1, you'll substantially modify the current ordinance. It will probably be deleted. Okay. And so what you would want, then what would be left, the second ordinance goes away, then what would be left is people like Ishkan could just go out there and hand out. They could hand out literature. Literature, envelopes, as Judge Ferguson said. Precisely. And they may or may not be able to do that in restricted areas. Well, right now they would not be able to do it in restricted areas. Well, I mean, but that's under the current ordinance. If you got rid of that current ordinance, there would be no restrictions. No, the restricted areas is not part of the ordinance. What it's part of is the TSA rules and regulations. Okay, so they would be able to hand out their literature, envelopes, in the areas that would be allowed by TSA. Right. That's what would be left. Right. Okay. Exactly. And under the current ordinance, they can receive money, but they can only do that in the restricted areas. In the restricted areas, or we're talking the 17107 applies only inside the terminals. Inside. Outside the terminals, I guess you could say it's fair game. Okay. Whatever you want to do. All right. So they can receive money outside. Right. Under the current. That's why we said, look, all of these 60 million people, they're out there on the sidewalk at one time or another. The only thing I wanted to say is on CUBA was I don't see CUBA as necessarily validating Carreras. I see it as following Carreras. Right. That's right. Thank you. What about these people that used to come around and they'd hand you something, and it was a person who was deaf and dumb, huh? They'd be there all the time. You'd be sitting there, and they'd come by, and they'd hand you something, and then they'd pass them out to other people. Then they'd come around, and they'd want to see if you wanted to give them some money for it. Are they still doing that? They used to do that up in the, as you may recall, before all these new security rules. In the waiting rooms, yeah. They used to be in the waiting room, and they'd come by, and we all experienced that. Yeah. That doesn't happen anymore, and the reason it doesn't happen anymore is because there's really no place for anybody to sit down anymore in front of security. If you walk what we've talked about as the green areas, those 211,000 square feet, they need very hard press to find a chair. They need sedentary people for that purpose. They need that because you need them to stay because they're going to be there, and they're going to walk, and they're going to come back. You know, I'll think about this. Should I give to them? And then some people do, some people don't. And that would not be permitted, but I can't imagine it being a practice that Well, why not let them in to those seated areas? Because the TSA has adopted security rules in accordance with the Aviation Transportation and Safety Act that says that if you don't have a ticket, you can't go back there, so that there isn't a problem regarding those kinds of things because people who are from these organizations can't go back there anyway. Well, a lot of people don't have tickets to go back there. They work for the airport, or they're doing stuff for vendors and all that. The vendors and the employees certainly go back there. They have to to do their job. Yeah. But people that are not associated with employment at the airport or people that don't have tickets don't go back there. Can't you get people and check them out for security and all that and give them one of those things they put around their neck? No, the TSA would not allow that. There are very intricate rules insofar as who gets a badge, and the TSA would not allow a badge to any of those groups. Has any of this ever presented to TSA? I can't say specifically, but in the meetings, first of all, they do things you don't – often you see the rules in their regulations after they're implemented, and I'm not privy to some meetings where airport representatives are there, but I've just heard from the airport representatives that they don't want anybody having badges other than those people – that is, allow people back there other than the ones that have tickets. That's their primary goal. But there are other people that go back there that don't have tickets. They work at Starbucks. They work at other places. Well, they are required to be back there to work, but other than those that are required, other than those that have tickets, there's no one else goes back there. What if a Starbucks employee and his lunch hour is out soliciting? I was waiting for that question. Theoretically, since it would be inside the terminal area under 2327, they couldn't do that. The employee could not do that because it's inside. What if they wanted to pass out religious literature? They could do that. And what if somebody wanted to give them a contribution? As long as they don't – if you're just sitting there and someone walks up to you and says, would you like this $10 for your cause, you haven't solicited. You've just accepted. So, theoretically, the two haven't met. It has to be a solicitation and an immediate receipt. So if you're just sitting there and someone gives you something, that would not come within their – So you have a big sign on your head, I don't solicit, but I don't refuse donations. That would – You're not obligated to give me a tip, but, you know, here's this big jar with money in it already. Well, I would consider if there's a big jar with, say, a picture of a starving person or something, that that would be a form of solicitation. All right. Thank you. You don't have this problem at Burbank, do you? Well, you have nothing to do at Burbank. We're not allowed to go to Burbank.
judges: Pregerson, Trott, Paez